# JAMES C. STEVENS

## *v.*

# WILLARD HOLLINGSWORTH *et al.*

1. HOMESTEAD — *whole ground exempt.* The intention of the legislature, in enacting the homestead exemption law, was not to save a mere shelter for the debtor and his family, but it was to give him the full enjoyment of the whole lot of ground exempted, to be used in whatever way he might think best for the occupancy and support of his family, whether in the way of cultivating it, or by the erection of buildings upon it, either for carrying on his own business or for deriving income in the way of rent.

2. When a debtor owns a lot upon which he resides, and upon which he has a mill, shop or other building, the whole property is his homestead, and as such exempt from execution to the extent of one thousand dollars.

3. Where the homestead of a debtor is sold on execution without any division, although it may be worth more than one thousand dollars, yet the purchaser acquires no title to any part of it which he can make available in an action of ejectment, either as plaintiff or defendant, whatever may be the rule in equity.

APPEAL from the Circuit Court of Mercer county; the Hon. GEORGE W. PLEASANTS, Judge, presiding.

Mr. B. C. TALIAFERRO, for the appellant.

Mr. I. N. BASSETT, for the appellees.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

This was an action of ejectment, by appellant against appellees, which, on the trial in the court below, resulted in a judgment for appellees.

One count in the declaration is for a mill-house, machinery and appurtenances to the mill, situated on lot four in block six in Keith's second addition to the town of Keithsburg in the county of Mercer, and the only controversy is in respect to this property.

It was admitted on the trial that the lot was, from before the second day of March, 1869, until the time of trial, the homestead of the plaintiff, who was the head of a family, residing

with the same thereon; and that the defendants were in the possession of the mill-house and machinery in controversy, but of no other part of the lot.

The evidence shows that the lot is 156½ feet long, about 100 feet of the south end being occupied by the plaintiff's residence and yard, and the mill occupying about 20 by 40 feet of the north end. There is also another lot owned by plaintiff adjoining this one, on which he has fruit trees, etc.

The defendants claimed to be lessees of Abercrombie, who claimed to be the owner of the lot by virtue of a deed made to him by the sheriff of Mercer county on the fourth day of February, 1871. This deed was supported by a judgment of the circuit court of Mercer county, rendered on the second day of March, 1869, against the plaintiff, for $466, upon which execution was issued and levied on the lot, which was sold to John C. Humphreys, and he assigned his certificate of purchase to Abercrombie. There is no evidence that the plaintiff ever abandoned his residence on the lot, or that he ever relinquished, in writing, his claim of homestead in the mill. It is claimed, however, by the defendants, that he voluntarily surrendered the mill to Abercrombie, and, subsequently, with the defendant, Willard Hollingsworth, rented the same from Abercrombie.

There is a conflict of evidence upon this point, but we think the preponderance is clearly with the plaintiff.

Abercrombie is a son-in-law of plaintiff, and claims that he bought the certificate of purchase at the request of plaintiff, to keep the property from falling into the hands of strangers. Plaintiff denies that he ever requested him to purchase the certificate, but they agree that it was understood that if plaintiff would refund to Abercrombie his money, plaintiff was to retain the property.

Abercrombie swears that plaintiff gave him possession of the property when he got his deed; that he then rented it to one Young for a time, and subsequently to plaintiff, and Willard Hollingsworth, one of the defendants; that plaintiff after-

wards requested him to rent the property to one Brewer ; that plaintiff and Hollingsworth being unable to agree, he resumed possession of the property, and then rented it to the defendant Willard Hollingsworth. He says that plaintiff did not object to this, but did not seem pleased with the arrangement.

Plaintiff swears that he rented the mill to Dunn and Thompson on the 15th day of June, 1870; that they afterwards sublet it to Hinsey and Smith, who sub-let it to Young; that Young, on quitting the mill, surrendered it to plaintiff; that he remained in possession until the eleventh day of December, 1873, when Abercrombie came into the mill, saying that he was going to take plaintiff's place; that for fear of having trouble he went out of the mill, fully determined to test the title to the property. He further swears that the defendant Willard Hollingsworth was his partner in the mill at the time; that he (Hollingsworth) refused to let plaintiff have any thing to do with the mill, after Abercrombie ordered him out, and thenceforth refused to recognize him as his landlord; that, when he first let Hollingsworth into the mill, Hollingsworth was to pay him $500 per annum rent; that subsequently it was agreed between plaintiff, Hollingsworth and Abercrombie that Hollingsworth should pay Abercrombie $250 per annum, which Abercrombie was to apply on what he had paid for the certificate of purchase; and that plaintiff agreed to pay Abercrombie as much more as he could. He positively denies that he ever rented the property from Abercrombie.

Plaintiff is sustained in his version in regard to the renting to Young by his son, Charles Stevens, and G. L. Dunn. He is sustained in his statement that he and the defendant Willard Hollingsworth went into partnership while he was himself in possession of the mill, and that Hollingsworth rented from him and not from Abercrombie, by David Hinsey, who swears: "Willard Hollingsworth, one of the defendants, ordered Stevens, the plaintiff, out of the mill. This was after Abercrombie came and took possession. Hollingsworth told me that, in the first place, he had arranged to run the mill in

partnership with Stevens, and was to pay Stevens $22 per month, and furnish means to run the mill, and that Stevens was to keep up the engineer's part."

By Charles Stevens, who swears: "Hollingsworth first went into partnership with father. * * * Father had possession and continued in possession until Hollingsworth came into the mill with father. * * * I heard Abercrombie say he was satisfied when he got his money back, and father said he would pay him out of the rent of the mill."

And by B. O. Taliaferro, who swears, after proving demand made by him on the defendants for the possession of the mill, for plaintiff: "Hollingsworth refused to give possession; he stated to me that he had commenced running the mill in partnership with Stevens, in the first place, but he had afterwards rented of Abercrombie; that he was running it under Abercrombie's lease and would not give Stevens possession."

We are not satisfied, from the evidence, that plaintiff ever voluntarily surrendered possession of the property to Abercrombie, but, on the contrary, are of opinion that it was agreed between these parties that Abercrombie, instead of insisting on his claim of ownership to the property, was to accept from plaintiff what he had paid for his certificate of purchase; and that the rents were to be appropriated in this way. This view, in connection with the fact, which seems to have been known, that Abercrombie had the certificate of purchase, sufficiently explains why Brewer, in desiring to rent the property, deemed it important to have Abercrombie's consent to any negotiation he should make, and why plaintiff consulted him in that respect.

This brings us to the question, did Abercrombie's deed give him a legal right to the possession of the property? It is insisted, for the defendants, that notwithstanding plaintiff's dwelling-house, etc., is on the same lot with the mill, yet inasmuch as the mill itself is no part of his residence, and he uses an adjoining lot, in part, for fruit and vegetables, and the portion occupied by the mill may be separated from the residue

of the lot without inconvenience, it cannot be a part of his homestead. *Linton et al.* v. *Quimby,* 57 Ill. 271, and *Loomis* v. *Gerson,* 62 id. 11, are cited in support of the position. In the first of these cases lots 12, 13, 14 and 15 had been sold on execution, and it was asked that the sale be set aside for the reason that they were the complainant's homestead. The court set aside the sale as to lot 13, only. It was shown that complainant's residence was on this lot, and that it greatly exceeded in value $1,000. This court held that the complainant had received all the relief to which he was entitled. It was, however, said: "If the lots had been sold in a body, it would have been impossible to give this relief without setting the sale aside as to the other lots. But, as they were sold separately, complete justice can be rendered to Linton as to his homestead rights without doing a wrong to Quimby. The fact that each lot was sold separately, and that the lot on which Linton's house was situated was confessedly worth more than one thousand dollars, makes it easy to fix the precise limit to which the court should go in administering equitable relief." It will thus be seen that whatever inferences, applicable to the present case, can be drawn from that case, are against the defendants. Here, the sale was of the entire lot, and it is impossible to apportion the amount bid to any particular part of it.

In the other case referred to, it was held, on bill filed to set aside a sale on the ground that the premises were a homestead, it appearing that the premises were worth $1,800, that the sale should not be absolutely set aside, but that the purchaser should be allowed to pay the $1,000 to the defendant in execution, if he so chose, and retain the property. But this was upon equitable principles purely, and manifestly can have no application in an action of ejectment, where the naked legal title only can be considered. Moreover, instead of being an authority to show that the right of homestead does not extend to the entire lot upon which the dwelling-house is located, it by implication recognizes the opposite doctrine.

. . The language of the statute is, " The lot of ground and the buildings thereon, occupied as a residence," etc., " shall be exempt," etc.

In *Walters* v. *The People*, 18 Ill. 197, it was held a tract of timber, a mile from the farm land, and not adjoining, yet from which supplies of timber, rails, firewood, etc., were alone derived for the support of the farm, was not a part of the homestead. And this construction was given to the statute on account of its peculiar phraseology. It was said: " This lot of ground may be but a few feet square, while the debtor owns thousands of acres in many other tracts. It may, again, contain thousands of acres in one compact body, embracing many surveys or legal subdivisions."

The *dictum* in *Reinbach* v. *Walter*, 27 Ill. 393, does not assert a contrary principle. In that case there were two lots, and it does not appear that a division should have been made, except by the lines of the lots. But the question was not before the court, anyhow, and what was said in this respect was but *obiter dictum.* ·

In *Thornton* v. *Boyden*, 31 Ill. 211, which was ejectment for eighty acres of land, it was held competent for defendant to show that the land adjoined his dwelling-house, which was on a town lot, and was claimed by him as a homestead.

In *Hubbell et al.* v. *Canady*, 58 Ill. 426, bill was filed to set aside a sale on execution of the west half of a certain town lot. The whole lot was 60 by 120 feet. The dwelling-house was mostly on the east half of the lot; about four feet of it, and seven feet of the smoke-house, were on the west half, as also the garden, fruit trees and well. There was a store-house 20 by 45 feet on the west half of the lot, which set back six or eight feet from the end, and was in the occupancy of a tenant. It was held that the whole lot constituted the homestead, and was exempt from the sale.

It was said: " The whole lot of ground is covered by the exemption, not some part of it, and the lot included all the buildings upon it.

" We are not to regard the intention of the legislature as being only to save a mere shelter for the debtor and his family, but that it was the purpose to give him the full enjoyment of the whole lot of ground exempted, to be used in whatever way he might think best for the occupancy and support of his family, whether in the way of cultivating it, or by the erection and use of buildings upon it, either for the carrying on of his own business, or for deriving income in the way of rent."

We are entirely satisfied with the correctness of these observations, and there is nothing in the present case to except it from their application.

While evidence has been received to show that two or more subdivisions of real estate constitute a lot, within the meaning of the homestead act, in no instance has evidence been received to show the lot was less than a subdivision, simply because the debtor used a portion of it for prosecuting his business. It would be difficult to explain, upon any principle of correct reasoning, why the farmer shall have his farm of eighty acres adjoining his dwelling-house on a town lot, and yet the mill of the miller, or the shop of the mechanic, although on the same lot with his dwelling-house, shall not be exempt. Or, narrowing the application, why the garden, stables, yards, orchard, etc., shall be exempt, and the shop, mill or business house, although indispensably necessary to earn a support for the family, and located on the same lot of ground with the residence, shall not be exempt. The homestead, however, is not limited to the ground occupied by the residence, but to the lot of ground and the buildings thereon, and each is presumably of the same importance to the debtor.

But it is further argued that the lot exceeded in value one thousand dollars, and the judgment was a lien on the excess; that the sale, therefore, was but voidable, and that the plaintiff, having voluntarily abandoned the property and yielded its possession, Abercrombie's title became perfect.

The sale was of the entire lot, and there is no pretense

plaintiff ever abandoned his residence; nor, as we have befcre said, does the evidence, in our opinion, show that plaintiff voluntarily abandoned the mill. He yielded simply to what he considered an intrusion, and, as he says, with the intent to assert his rights by law. It cannot be assumed that the individual, who leaves his property in the possession of a trespasser rather than resist his aggressions, thereby loses all legal remedy for the assertion of his ownership and right of possession. Yet this is, practically, what plaintiff claims to have done, and what, we think, the evidence shows he did do. No steps were taken, pursuant to the requirements of the statute, to subject plaintiff's homestead to sale, upon the supposition that the property was divisible, or that it exceeded in value $1,000.

A reference to the previous decisions of this court will, it is believed, show, without a single exception, that a title so acquired to a homestead cannot avail in an action of ejectment, either to sustain a recovery by the plaintiff, or when interposed as a defense by the defendant.

In *Green* v. *Marks*, 25 Ill. 221, the general principle was announced that a judgment and execution do not create a lien against the homestead, and the owner may sell or mortgage it, free from any lien of the judgment. In that case, however, it appears the value of the property, in fact, did not exceed $1,000; still the reasoning of the court applies with equal force where the value of the homestead exceeds that amount. The gist of it lies in these remarks: " The judgment lien upon lands, then, being conferred by statute alone, and not as a common law right, it can only attach and become effective in the mode, at the time, and upon the conditions and limitations imposed by the statute itself. Our statute is not in aid of a common law right to sell real estate, but it confers the right. * * * This statute is silent as to any lien on the homestead. The third section, it is true, authorizes the creditors or the officer having an execution, if they believe the value of the property to be of greater value than one thousand

27—74TH ILL.

dollars, to have it appraised, and if it is so found, to have so much of the premises, including the dwelling, set off for the debtor, if susceptible of division, as may be worth that sum, and authorizes the sale of the remainder." Then, after quoting other provisions of the act, it is added : " The legislature have manifested, in an unmistakable manner, the design to secure the debtor, and his family after his death, in the enjoyment of a home. They have carefully guarded the right, when the tract of land is of greater value than the amount of the exemption, by having the homestead of that value set off to him, if susceptible of a division, and if not, then on a sale one thousand dollars is required to be paid to him."

In *Patterson* v. *Kreig*, 29 Ill. 518, it was held it could be proven as a defense on a trial in ejectment, that the property was the homestead of the defendant. In *Smith* v. *Miller*, 31 Ill. 160, this was reasserted, but it was also there held that where a homestead which exceeded $1,000 in value was mortgaged, the mortgage was good as to the excess over $1,000, notwithstanding the right of homestead was not properly released in the mortgage.

In *Pardee* v. *Lindley*, 31 Ill. 183, it was also held that it is competent to prove, on the trial of an ejectment, that the premises in controversy are the homestead of the defendant ; and it was further held that the fact that they exceeded one thousand dollars in value was immaterial in this action.

*Thornton* v. *Boyden*, in the same volume, at 211, refers to and approves what was said in *Pardee* v. *Lindley*.

In *Booker* v. *Anderson*, 35 Ill. 86, while it is said a mortgage or deed of trust is not a lien against the homestead, it is also said, " If worth more than that sum it was, no doubt, binding as a lien on the overplus, which could be subjected to the payment of the debt in the mode prescribed by the statute."

*Brown* v. *Coon*, 36 Ill. 246, overrules and modifies *Patterson* v. *Kreig*, so far, that it was held that where the homestead is conveyed, either with or without an express statutory relinquishment, and actual possession is given to the grantee, by

the voluntary withdrawal of the husband and wife, the home-stead as to *such grantee, and persons claiming under him, and in his and their favor, is abandoned, but* only as to them.

But in that case it was expressly conceded to be the law, in the case of a mortgage of a homestead, without the statutory relinquishment, and not followed by an abandonment of the homestead by the mortgagor and his wife : "If the premises were worth less than $1,000, the mortgage was practically inoperative for any form of action, so long as the mortgagor should choose to assert his homestead rights. If they were worth more than $1,000, although the mortgage was at once operative for the surplus, yet it could not be enforced by eject-ment until the homestead had been set off, as the court, in that action, could not determine how far the homestead right would extend."

In *Blue* v. *Blue et al.* 38 Ill. 18, it was said : "It is ob-jected that there is no evidence to show that this tract was worth only one thousand dollars, or less. This cannot vary the result, as, if it was not worth more than that sum, the sale was prohibited by the statute, and if worth more, then none of the requirements of the statute were observed in making the levy and sale ; so that, in either view, the sale was unauthorized."

The same was also again held in *Bliss* v. *Clark*, 39 Ill. 590, the court, among other things, saying : "That the statute de-signed the premises, to the extent of $1,000, to be free from the operation of the lien, is manifest from the fact that the excess over and above the value of that sum may be levied and sold in the mode pointed out by the act ; and if not sus-ceptible of division, then the entire premises may be sold, upon the creditor paying $1,000 to the debtor, which is declared to be exempt for one year. If the right to occupy, or the land itself, had been intended to be subject to the lien of the judg-ment, why not authorize a sale, subject to the right of the debtor to occupy it as a homestead ? "

In *McDonald* v. *Crandall*, 43 Ill. 236, it was said : " It has, however, been held, that where the homestead property

exceeds $1,000 in value, a judgment, a mortgage, or deed of trust, becomes a lien that may be enforced against the surplus."

It would thus seem that, if the repeated assertion of a principle can be regarded as making it settled law, it is the settled law of this court that, while a judgment against a debtor, whose homestead exceeds in value one thousand dollars, is a lien on the excess over the one thousand dollars, that lien can only be enforced in the mode prescribed by the statute; and if the judgment creditor proceeds to sell the homestead and acquires a deed to it, disregarding the statutory requirements, his deed is not admissible in ejectment against the claim of homestead, either in attempting to recover possession, or in defending his possession.

Where a bill in chancery is filed to set aside a sale, on the ground that the property sold was the homestead of the complainant, the chancellor may, undoubtedly, in the exercise of the equitable powers with which he is invested, cause the property to be divided and set aside the sale only as to so much as shall be found, if the property be divisible, of the value of $1,000; or require the complainant, if the property be not susceptible of division, to accept the $1,000 for his homestead if the purchaser shall elect to retain it and pay the amount, as was held in *Loomis* v. *Gerson, supra;* but a court of law, in the trial of an ejectment, obviously can exercise no such powers.

We are therefore of opinion, that the deed of Abercrombie was no justification to the defendants, who held and attempted to justify under that title. The judgment must be reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

*Judgment reversed.*